THE PEOPLE OF THE STATE OF NEW YORK ex rel. ALEX-
ANDER KARLIN, Appellant, v. CHARLES W. CULKIN,
as Sheriff of the County of New York, Respondent.

In the Matter of the Investigation upon Petition of the
ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK
et al., Respondents.

ALEXANDER KARLIN, Appellant.

Courts — attorneys — contempt — habeas corpus — Appel-
late Division has power to direct general inquiry into conduct
of members of the bar — member of bar may be compelled to
testify as to his professional acts — refusal to be sworn a
contempt — habeas corpus properly dismissed.

1. The Appellate Division of the Supreme Court has power to direct
a general inquiry into the conduct of its officers, the members of the
bar, and in the course of that inquiry to compel one of those officers
to testify as to his acts in his professional relations, subject to his
claim of privilege if the answers will expose him to punishment for
crime.

2. Such power is incidental to the control of the Supreme Court
over attorneys and counselors at law which was recognized in the
Constitution of 1777, and has been confirmed by the existing statutes.
The history of such control in England and in this State reviewed,
and the authorities collated.

3. The refusal of a member of the bar to be sworn when called to
testify at such an inquiry, constituted, therefore, a contempt (Civ.
Pr. Act, § 406); he was properly committed to jail until he should
submit to be sworn and examined; and a petition for his release upon
habeas corpus was properly dismissed.

*People ex rel. Karlin* v. *Culkin*, 223 App. Div. 822, affirmed.

(Argued May 10, 1928; decided July 19, 1928.)

APPEAL from two orders of the Appellate Division of
the Supreme Court in the first judicial department,
entered April 2, 1928, the first of which affirmed an order

of Special Term dismissing a writ of habeas corpus and remanding the relator to custody, and the second of which affirmed an order of Special Term adjudging the appellant herein to be in contempt of court.

*Abraham Tulin* and *Leon A. Tulin* for appellant. The proceeding under review is unauthorized by the law of this State and is unconstitutional. (*McQuigan* v. *D., L. & W. R. R. Co.,* 129 N. Y. 50; *Saxton* v. *Stowell,* 11 Paige Ch. 526; *Matter of Brewster,* 12 Hun, 110; *Matter of Eldridge,* 82 N. Y. 161; *Matter of Kaufman,* 245 N. Y. 423; *Matter of Randel,* 158 N. Y. 216; *Matter of Goodman,* 199 N. Y. 143; *Matter of Robinson,* 209 N. Y. 354; *Matter of Flannery,* 212 N. Y. 610; *Ex parte Robinson,* 19 Wall. 505; *Ex parte Bradley,* 7 Wall. 364.) The general investigatory power assumed by the Supreme Court herein is an assumption of non-judicial power which is unwarranted by and in violation of section 1 of article VI of the Constitution of this State. (*People ex rel. McDonald* v. *Keeler,* 99 N. Y. 463; *Matter of Davies,* 168 N. Y. 89; *McGrain* v. *Daugherty,* 273 U. S. 135; *People ex rel. Bender* v. *Milliken,* 185 N. Y. 35; *Prentis* v. *Atlantic Coast Line,* 211 U. S. 210.) The order adjudging the appellant in contempt and committing him to jail was made in violation of the appellant's right to immunity from self-crimination under section 6 of article I of the Constitution of this State. (*Matter of Both,* 200 App. Div. 423; *Ward Baking Co.* v. *Western Union Telegraph Co.,* 205 App. Div. 723; *People ex rel. Travis* v. *Knott,* 204 App. Div. 379; *People* v. *Bermel,* 71 Misc. Rep. 356; *Brandon Manufacturing Co.* v. *Bridgman,* 14 Hun, 122; *Kinney* v. *Roberts & Co.,* 26 Hun, 166; 89 N. Y. 601; *Zamato Trading Co.* v. *Brown,* 27 Hun, 248; *Andrews* v. *Prince,* 31 Hun, 233; *Kellog* v. *Sowerby,* 32 Misc. Rep. 327; *Ely* v. *Perkins,* 57 Misc. Rep. 361; *People's Coat, Apron & Towel Supply Co.* v. *Light,* 168 App. Div. 142.)

*Isidor J. Kresel, Bernard Hershkopf* and *Leon Leighton* for respondent. The Appellate Division had jurisdiction to order this investigation. (*Matter of Berkovitz* v. *Arbib & Houlberg*, 230 N. Y. 261; *McQuigan* v. *D., L. & W. R. R. Co.*, 129 N. Y. 50; *Davis* v. *Zimmerman*, 91 Hun, 489; *German Alliance Ins. Co.* v. *Kansas*, 233 U. S. 389; *Briggs* v. *Mackellar*, 2 Abb. Pr. 30; *Wilckens* v. *Willet*, 1 Keyes, 521; *People ex rel. McDonald* v. *Keeler*, 99 N. Y. 463; *People* v. *Sharp*, 107 N. Y. 427; *McGrain* v. *Daugherty*, 273 U. S. 135; *Kilbourn* v. *Thompson*, 103 U. S. 168; *Matter of Bar Assn. of City of New York*, 222 App. Div. 580.) The court, after due consideration, has properly exercised its discretion by instituting the present inquiry as the appropriate means of asserting its indisputable power to control attorneys. (*Matter of Peters*, 221 App. Div. 607; *Hamilton* v. *Wright*, 37 N. Y. 502; *Matter of H., an Attorney*, 87 N. Y. 521; *Matter of Reifschneider*, 60 App. Div. 478; *Sherman* v. *Yankee Products Corp.*, 201 App. Div. 647; *Matter of Rouss*, 221 N. Y. 81; *Matter of Wilson*, 160 App. Div. 521; *People* v. *Alfani*, 227 N. Y. 334; *Matter of Phillips*, 143 App. Div. 522.) The appellant's objection that this investigation violates his right of privacy is at war with his duty as an attorney and officer of the court, and is overriden by the highest requirement of public policy, namely, the necessity of the courts to fulfill their essential purpose of administering justice. (*State ex rel. Reynolds* v. *Circuit Court*, 193 Wis. 132; 214 N. W. Rep. 396; *Rubin* v. *State*, 216 N. W. Rep. 513; *Matter of Richardson*, 247 N. Y. 401.) The commitment is in accordance with law. (*Matter of Hirschfield* v. *Hanley*, 228 N. Y. 346; *Matter of Hertle [In re Ahearn]*, 120 App. Div. 717; 190 N. Y. 531; *People ex rel. Fennell* v. *Wilmot*, 127 Misc. Rep. 791; *Stewart* v. *Smith*, 186 App. Div. 755; *People ex rel. Phelps* v. *Fancher*, 2 Hun, 226; *People ex rel. Jones* v. *Davidson*, 35 Hun, 471; *Matter of Taylor*, 8 Misc. Rep. 159.)

Cardozo, Ch. J. A petition by three leading bar associations, presented to the Appellate Division for the first judicial department in January, 1928, gave notice to the court that evil practices were rife among members of the bar. "Ambulance chasing" was spreading to a demoralizing extent. As a consequence, the poor were oppressed and the ignorant overreached. Retainers, often on extravagant terms, were solicited and paid for. Calendars became congested through litigations maintained without probable cause as weapons of extortion. Wrongdoing by lawyers for claimants was accompanied by other wrongdoing, almost as pernicious, by lawyers for defendants. The helpless and the ignorant were made to throw their rights away as the result of inadequate settlements or fraudulent releases. No doubt, the vast majority of actions were legitimate, the vast majority of lawyers honest. The bar as a whole felt the sting of the discredit thus put upon its membership by an unscrupulous minority.

It spoke its mind through its associations, the organs of its common will. The court was asked to inquire into the practices charged in the petition, and any other illegal and improper practices, either through an investigation to be conducted by itself or through some other appropriate procedure. It was asked upon the conclusion of the investigation to deal with the offenders in accordance with law, and to grant such other remedies as would avoid a recurrence of the evil and maintain the honor of the bar.

The court responded promptly. It held (speaking by its presiding justice) that its disciplinary power is not limited to "cases where specific charges are made against a named attorney." It will act of its own motion whenever it has reasonable cause to believe that there has been professional misconduct either by one or by a class. Information may be adequate to define the offense and identify the offender. If so, charges will be preferred,

and the offender brought to trial. On the other hand, information may be so indefinite as to make charges impossible or improper without further inquisition. If so, the power of inquisition, it was held, is commensurate with the need. " Only by such means will the court be able to devise appropriate rules to prevent the continuance of such evil practices and bring the unworthy to judgment and protect the worthy in the profession from suspicions in the public mind."

The order of the Appellate Division designates a justice of the Supreme Court to conduct the investigation at an appointed term with full authority " to summon witnesses and to compel the giving of testimony and the production of books, papers and documentary evidence." The petitioning associations are authorized to furnish counsel in aid of the inquiry. The investigation is to extend into the practices described in the petition and any other practices obstructive or harmful to the administration of justice. The court conducting the inquiry is to report the proceedings to the court making the order, *i. e.,* the Appellate Division, with its opinion thereon, and upon the coming in of the report there is to be such other and further action as shall seem just and proper.

The investigation proceeded in the form directed by the order. Many witnesses were examined. They were given the privilege at their option of examination *in camera.* There came a time when the appellant, a member of the bar for twenty-five years, was served with a subpœna. He appeared in court, but refused to be sworn. His practice had involved the trial of many actions for personal injuries. He was called to testify as to his conduct in the procurement of retainers in these cases and in others. There is no denial that the testimony had relation to the ends of the inquiry. His refusal to testify was a challenge to the inquiry as a whole. Upon his persisting in that challenge, the court adjudged him in contempt and committed him to jail until he

should submit to be sworn and examined. A petition for his release upon habeas corpus was dismissed. Both orders, the one adjudging the contempt and the one dismissing the writ, were affirmed by the Appellate Division. They are now before this court.

The precise question to be determined is whether there is power in the Appellate Division to direct a general inquiry into the conduct of its own officers, the members of the bar, and in the course of that inquiry to compel one of those officers to testify as to his acts in his professional relations. The grand jury inquires into crimes with a view to punishment or correction through the sanctions of the criminal law. There are, however, many forms of professional misconduct that do not amount to crimes. Even when they do, disbarment is not punishment within the meaning of the criminal law (*Matter of Rouss*, 221 N. Y. 81, 85). Inquisition by the court with a view to the discipline of its officers is more than a superfluous duplication of inquisition by the grand jury with a view to the punishment of criminals. The two fields of action are diverse and independent. True, indeed, it is that disbarment may not be ordered without notice of specific charges (Judiciary Law [Cons. Laws, ch. 30], § 476; *Matter of Eldridge*, 82 N. Y. 161; *Matter of an Attorney*, 83 N. Y. 164). So also an indictment must precede a conviction of a felony. We cannot know to-day whether charges will be laid against the relator as an outcome of his testimony or of the testimony of others. If preferred, they will be the subject of a separate proceeding, as separate as proceedings before and after an indictment. The requirements of the law as to the formulation of a charge are inapplicable to an inquisition in advance of the preferment of the charge.

". Membership in the bar is a privilege burdened with conditions " (*Matter of Rouss, supra*, p. 84). The appellant was received into that ancient fellowship for something more than private gain. He became an officer of

the court, and, like the court itself, an instrument or agency to advance the ends of justice. His co-operation with the court was due whenever justice would be imperilled if co-operation was withheld. He might be assigned as counsel for the needy, in causes criminal or civil, serving without pay (Code Crim. Pro. § 308; Civ. Prac. Act, §§ 196, 198). He might be directed by summary order to make restitution to a client of moneys or other property wrongfully withheld (*Matter of H., an Attorney*, 87 N. Y. 521). He might be censured, suspended or disbarred for " any conduct prejudicial to the administration of justice " (Judiciary Law, §. 88, subd. 2). All this is undisputed. We are now asked to hold that when evil practices are rife to the dishonor of the profession, he may not be compelled by rule or order of the court, whose officer he is, to say what he knows of them, subject to his claim of privilege if the answer will expose him to punishment for crime (*Matter of Rouss, supra*). Co-operation between court and officer in furtherance of justice is a phrase without reality if the officer may then be silent in the face of a command to speak. There are precedents of recent date, decisions in Wisconsin and Ohio, upholding the power of the court by a general inquisition to compel disclosure of the truth. (*Rubin* v. *State*, 216 N. W. Rep. 513; Ohio Ct. of App., 26 Ohio Law Bull. 355, 515.) Precedents far more ancient, their roots deeply set in the very nature of a lawyer's function, point the same way.

" The supreme court shall ʳhave power and control over attorneys and counselors-at-law " (Judiciary Law, § 88, subd. 2). The first Constitution of the State declared a like rule in terms not widely different. Provision was there made that " all attorneys, solicitors and counselors at law hereafter to be appointed, be appointed by the court and licensed by the first judge of the court in which they shall respectively plead or practice; and be regulated by the rules and orders of the

said courts" (Constitution of 1777, § 27). What was meant by this provision that lawyers should be "regulated by the rules and orders of the said courts?" Would the men who framed the Constitution of 1777 have been in doubt for a moment that a rule or order might be made whereby lawyers would be under a duty, when so directed by the court, to give aid by their testimony in uncovering abuses? We find the answer to these questions when we view the history of the profession in its home across the seas.

The barrister, unlike the attorney, was not in the strict sense an officer of the court where he was privileged to speak (Halsbury, Laws of England, vol. 2, p. 385, title Barristers; *Wettenhall* v. *Wakefield*, 1833, 2 Dowl. 759). He was called to the bar upon the nomination of the inns of court, whose members exercised that power as the delegates of the judges (*King* v. *Benchers of Gray's Inn*, 1780, 1 Douglas, 353, per MANSFIELD, L. C. J.; *King* v. *Benchers of Lincoln's Inn*, 4 B. & C. 855; 2 Holdsworth, History Laws of England, 496; 6 id. 434; Pearce, Inns of Court [2d ed.], 405, 415; Halsbury, *supra*, vol. 2, p. 360). If a barrister was suspected of misconduct, the benchers of his inn might inquire of his behavior. We can hardly doubt that refusal to answer would have been followed by expulsion. There was thus little occasion for controversies as to discipline to be brought before the judges unless the benchers failed in the performance of their duties. In case they did fail, a supervisory power was ever in reserve. The inns being unincorporated associations were not subject to mandamus (*King* v. *Benchers, etc.*, 1 Douglas, 353; *King* v. *Benchers, etc.*, 4 B. & C. 855; Pearce, Inns of Court, *supra*). They were subject, however, to visitation by the judges (*King* v. *Benchers, etc.*, *supra*; Pearce, *supra*). What the court could not do by the instrument of a writ, the judges did by orders in their capacity as visitors. They were not diffident or chary in announcing their pleasure or dis-

pleasure. Dugdale's Origines Juridiciales contains a record of the orders of the judges in the exercise of their control over members of the inns. The conduct of the barristers was regulated with minute particularity, even in matters so personal as the growth of their beards or the cut of their dress (see, *e. g.*, 4 Holdsworth, History of English Law, 264; 6 id. 434; Dugdale, *supra*, pp. 191, 310, 311, 314; 1 Cunningham, Historical Memorials, 208–240; 2 Black Books of Lincoln's Inn, 20, 21, 30, 31, 32, 47, 132, 275, 392, 393, 410, 432, 440, 451, 454; 3 Black Books, 445; Pension Book of Gray's Inn, pp. 61, 91, 102, 120, 169, 212, 279, 290, 295, 337; 2 Middle Temple Record, 986, 987; 3 Inner Temple Records, 30). Short shrift would there have been for the barrister who refused to make answer as to his professional behavior in defiance of the visitors.

The attorney, unlike the barrister, was not a member of an inn, but an officer of the court, and subject to its orders (6 Holdsworth, 434). These orders might be general, not directed to a single attorney as the outcome of a controversy, but announcing rules of conduct to be adhered to in the future. Many prohibitions now imbedded in our law, often with the added sanction of a legislative enactment, came into being through regulations or orders adopted by the court of its own motion to put an end to some abuse. Thus, by section I of an order made in Michaelmas Term, 1654, by the Court of Common Pleas, as well as by a like order of the Court of Upper or King's Bench, attorneys were required to give notice of their chambers or habitations " under pain of being put off the roll; " no one, under like penalty, was to practice in another's name, nor was any one knowingly to permit another to practice in his name, excepting in warrants of attorney for common recoveries; " for the prevention of maintenance and brocage, no attorney was to be lessee in an ejectment nor bail for a defendant in this court in any action "

(Cooke's Rules, Orders and Notices of the Courts of Common Pleas and King's Bench, Michaelmas Term, 1654).

The plenitude of the control thus asserted over the behavior of attorneys would lead us to infer that there was power to compel them to submit to an inquisition as to professional misconduct, even if precedent more precise were lacking for such an exercise of power. The curious thing is, however, that precedents more precise exist. More than three centuries ago evils not unlike those revealed in this petition disturbed the English courts. They met the situation in much the same way, by an inquest under oath as to the conduct of their officers.

In Easter Term, 9 Eliz. 1567, the lord chief justice of the Common Pleas delivered a charge to a jury made up of officers, clerks and attorneys, who had been summoned by special writ to inquire into wrongdoing by officers of the court (Cooke's Rules and Orders in the Common Pleas). This was not a grand jury in the usual sense, for the Common Pleas was not a court of criminal jurisdiction. The ordinary courts of criminal jurisdiction were the King's or Queen's Bench and the Courts of the Justices of Assize, Oyer and Terminer and Gaol Delivery (Stephen, History of the Criminal Law, vol. 1, p. 75; Jenks, Short History of English Courts, pp. 170–174; Holdsworth's History of English Law, vol. 1, pp. 198, 212; Coke, 4 Institutes, 99). The special jury was instructed to inquire into falsities, erasures, contempts and misprisions, " *de omnibus falsitatibus, de rasuris, de contemptibus, et de misprisionibus.*" Those guilty of falsities were the ambulance chasers of the day. A falsity, said the lord chief justice, is " where a man outwardly will set a shew, a face and countenance that he doth well, and truly knowing inwardly and to himself that it is not so but mere subtlety and falsehood, as, for example, if he will sue forth of purpose false

1928.]          Opinion, per CARDOZO, Ch. J.     [248 N. Y. 465]

process, or wittingly of himself will minister a false and
foreign plea, not taking it of his client." An erasure,
as its name imports, is a wrongful alteration of a record
of the court. A contempt is committed by " such as
contemn and break our orders and rules, and will not
obey the orders of this court; within this are not only
officers, clerks and attorneys contained, but also any
other stranger that contemneth the same." A misprision
" is where a man knoweth treason or felony to be done,
and yet doth conceal it and keep it close." This might
seem, if it had been left unqualified, to be a license to
inquire into misprisions generally. A qualification swiftly
followed. " The misprision you are to inquire of is
*misprisio clerici*," as where writs have been fraudulently
put in without the seals required by law. The offense
was thus linked to the jurisdiction of the court. The
charge closes with an arraignment of disloyal or negligent
attorneys, and an appeal to the jury to hold them to
their duty. Our court is " slandered and evil spoken of,
our cares and labors made void and frustrate " by the
" negligence of clerks and ministers; " the client " begin-
neth to think evil of us that are judges, to suspect our
skill," and to speak evil of the law. " Of these and
like negligences " the jury shall inquire; and also of such
attorneys " as be late and slack comers to the Term by
reason whereof their clients' matters go not forward."
" We shall deprive such of their attorneyship." The
end of the inquisition was, not punishment, but discipline.
" I will appoint you no time certain," said the lord chief
justice in conclusion, " but that you may do it at your
leisure in time convenient between this and Michaelmas
Term; if you will have such as give evidence to be sworn,
we shall find the means that they shall be sworn." The
inquest was not to lack the sanction of an oath.

In Michaelmas Term, 1654, both the Common Pleas
and the King's Bench resorted to a like expedient for
the discipline of attorneys as well as other officers (Cooke's

Rules, Orders and Notices in the Court of Common Pleas and in the Court of King's Bench).

The order of the Common Pleas is divided into sections. Section III bears the title " concerning the reformation and punishment of abuses in general." It is " ordered that a jury of able and credible officers, clerks and attorneys once in three years be impaneled and sworn to inquire:

" 1. Of the points usually inquirable by the writ, viz., falsities, contempts, misprisions and offences.

" 2. Of such who have been admitted attorneys or clerks and are notoriously unfit, their names to be presented to the court, and they to be punished or removed, as the case shall require.

" 3. Of new or exacted fees, and of those that have taken them under whatsoever pretense, and to prepare and present a table of the due and just fees that the same may be fixed and continue in every office, and likewise for the Fleet.

" And that some persons be enjoined and sworn to give evidence, viz., some clerks of the court, and some attorneys in every county, not excluding others."

A system was thus established for a continuing inquiry into the conduct of attorneys with a view to their discipline and removal by a court of civil jurisdiction.

Supplementary to this system are the provisions of section IV, " concerning the better preservation of order among the officers and clerks, and observation of breach of orders and misdemeanors." By this section it was ordered " that the court do once every year in Michaelmas Term nominate twelve or more able and credible practisers in the court to continue for the year coming for these purposes hereafter limited; " that " they give information to the court from time to time of breaches of orders and miscarriages of officers, attorneys and clerks " (Cooke's Rules, Orders and Notices of the Court of Common Pleas).

Orders similar to those set forth in sections III and IV were made at the same term by the Court of Upper or King's Bench.

With this background of precedent there is little room for doubt as to the scope and effect of the provision in the Constitution of 1777 that attorneys might be regulated by rules and orders of the courts. The provision was declaratory of a jurisdiction that would have been implied, if not expressed. The next Constitution, that of 1821, was silent as to the whole subject, containing no reference either to regulation or to appointment. Promptly, to avoid misapprehension, the Legislature passed a statute, the act of April 17, 1823 (L. 1823, ch. 182, § 19), which continued in the same words the provision formerly contained in the Constitution of 1777. There was a revision of the statutes in 1827 (Act of Dec. 4, 1827), in which the provision was omitted, but the courts continued to act upon the theory that the power of regulation was either inherent or implied (*Matter of H., an Attorney*, 87 N. Y. 521). The question does not now concern us whether the power may be withdrawn or modified by statute (*Matter of Cooper*, 22 N. Y. 67, 68). Instead of being withdrawn, it has been explicitly confirmed. In 1912, by an amendment of section 88 of the Judiciary Law (L. 1912, ch. 253), the jurisdiction was removed from the realm of implication. The earlier statutes were restored through a renewed declaration that lawyers are subject to the control and power of the court. We are back to the law as it existed in 1777.

The argument from history is reinforced by others from analogy and policy. The power of the court in the discipline of its officers is in truth a dual one. It prefers the charges, and determines them (*Matter of Percy*, 36 N.Y. 651; *Randall* v. *Brigham*, 7 Wall. [U. S.] 523, 540; *Ex parte Wall*, 107 U. S. 265; *Fairfield County Bar* v. *Taylor*, 60 Conn. 11; *Matter of Durant*, 80 Conn. 140). Preliminary inquiry there must be, at least to some extent, before a decision

can be reached whether to prosecute at all (*Matter of Percy, supra*). Voluntary affidavits or even unsworn statements will often be enough (*Matter of Percy, supra; Randall v. Brigham, supra*). Occasions may arise where the probe must be more searching if justice is not to fail. The power to inquire imports by fair construction the power to inquire by methods appropriate and adequate, and so by compulsory process if search would otherwise be thwarted. Analogies are at hand to give support to that conclusion. A legislative body may act upon common knowledge or information voluntarily contributed. At times it stands in need of more. There is then power to investigate by subpœna under the sanction of an oath (*Briggs* v. *Mackellar*, 2 Abb. Pr. 30; *People ex rel. McDonald* v. *Keeler*, 99 N. Y. 463; *McGrain* v. *Daugherty*, 273 U. S. 135, 175; Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harvard L. Rev. 153, 167). " The right to pass laws, necessarily implies the right to obtain information upon any matter which may become the subject of a law " (*Briggs* v. *Mackellar, supra;* cf. the General City Law [Cons. Laws, ch. 21], § 20, subd. 21). Such analogies are not decisive, yet they reinforce in some degree the structure of the argument. A curious anomaly would be here if the courts with all their writs and processes could do less in regulating and controlling the conduct of their officers than a legislative body can do in relation to a stranger.

The argument is pressed that in conceding to the court a power of inquisition we put into its hands a weapon whereby the fair fame of a lawyer, however innocent of wrong, is at the mercy of the tongue of ignorance or malice. Reputation in such a calling is a plant of tender growth, and its bloom, once lost, is not easily restored. The mere summons to appear at such a hearing and make report as to one's conduct, may become a slur and a reproach. Dangers are indeed here, but not without a remedy. The remedy is to make the inquisition a secret

one in its preliminary stages.   This has been done in the first judicial department, at least in many instances, by the order of the justice presiding at the hearing.   It has been done in the second judicial department, where a like investigation is in progress (*Matter of Brooklyn Bar Assn.*, 223 App. Div. 149), by order of the Appellate Division directing the inquiry.   A preliminary inquisition, without adversary parties, neither ending in any decree nor establishing any right, is not a sitting of a court within the fair intendment of section 4 of the Judiciary Law whereby sittings of a court are required to be public. It is a quasi-administrative remedy whereby the court is given information that may move it to other acts thereafter (Cf. *Matter of Richardson*, 247 N. Y. 401, at pp. 413, 418).   The closest analogue is an inquisition by the grand jury for the discovery of crime.   There secrecy of counsel is enjoined upon the jurors by an oath of ancient lineage (Sir Frederick Pollock, Essays in the Law, p. 212).   It would be strange if disclosure were a duty upon an inquisition by the court.   There is a practice of distant origin by which disciplinary proceedings, unless issuing in a judgment adverse to the attorney, are recorded as anonymous (See, *e. g., Matter of an Attorney*, 83 N. Y. 164; *Matter of H., an Attorney*, 87 N. Y. 521).   The need of secrecy is the greater when the proceeding is in the stage of preliminary investigation.   Full protection against publicity was accorded to the relator if he had chosen to avail of it.   Publicity came to him through his refusal to be sworn.

We conclude that the refusal was a contempt (Civ. Prac. Act, § 406), and that the investigation must proceed.   In so holding we place power and responsibility where in reason they should be.   No doubt the power can be abused, but that is true of power generally.   In discharging a function so responsible and delicate, the courts will refrain, we may be sure, from a surveillance of the profession that would be merely odious or arbitrary.

They will act considerately and cautiously, mindful at all times of the dignity of the bar and of the resentment certain to be engendered by any tyrannous intervention. No lack of caution or consideration can be imputed to them here. They did not move of their own prompting, but at the instance of the very bar whose privacy and privilege they are said to have infringed. In the long run the power now conceded will make for the health and honor of the profession and for the protection of the public. If the house is to be cleaned, it is for those who occupy and govern it, rather than for strangers, to do the noisome work.

The orders are affirmed.

POUND, CRANE, ANDREWS, LEHMAN, KELLOGG and O'BRIEN, JJ., concur.

Orders affirmed.