**THE PENN FUEL.**

District Court, S. D. New York. August 22, 1929.

Single & Single, of New York City (Thomas H. Middleton, of New York City, of counsel), for the motion.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), opposed.

WOOLSEY, District Judge. This motion is denied.

The libel, which forms the background of this proceeding, was filed on behalf of underwriters by the Payne Coal Company, Inc.—hereinafter referred to as the coal company—as owner of a cargo of coal, to recover $750 for damage claimed to have been suffered by the coal while on board the barge Penn Fuel.

The parties to the proceeding, which is really independent of the libel, are, on the one side, the coal company and, on the other, Louis H. Rowe, Esq., who has been a member in good standing of the bar of this court since June 3, 1902.

The motion is made for a summary or mandatory order which would, in effect, grant specific performance of an alleged undertaking by Mr. Rowe to file a stipulation for the value of the barge Penn Fuel.

The jurisdiction invoked for this unusual proceeding is based solely on the inherent disciplinary power which this court has over attorneys who, by becoming members of its bar, have become its officers, and thus submitted themselves to its control, in so far as their professional activities are concerned.

There is not here any claim of professional misconduct by Mr. Rowe.

The only complaint against him is that he has failed and refused to perform an undertaking to give security to a libel filed in this court.

An examination of the record in this case on the admiralty docket of this court shows that the only steps which have been taken herein by the coal company are the filing of the libel and of the usual stipulation for costs required by the rules.

Process has not been issued either in rem or in personam.

No claim has been filed for the barge Penn Fuel, nor has Mr. Rowe filed any appearance on behalf of Mr. Joseph O'Connor, who did business as the Penn Fuel Company.

This court, therefore, has not secured jurisdiction over the barge or over the respondent. Accurately speaking there is not any case pending in this court entitled as these motion papers are entitled.

By entitling their application under the coal company libel, the counsel for the coal company have apparently sought to infuse into this proceeding some suggestion of admiralty jurisdiction. The application is in fact an entirely independent proceeding, and should have been entitled "In the Matter of Louis H. Rowe."

The libelant's counsel cannot escape from the docket situation, which I have described. They urge, however, that, in order to maintain the integrity of the undertakings for security which are so commonly given in admiralty practice here, I should order Mr. Rowe forthwith to file a stipulation for the value of the barge Penn Fuel and thus create the res which is of the essence in a proceeding in rem.

To this motion which is, in effect, a novel method of commencing a suit in admiralty, Mr. Rowe makes two objections: First, that the court is without jurisdiction to make the order sought; and, second, that the undertaking which he gave was not an agreement which bound him personally.

The circumstances under which it is claimed that Mr. Rowe has rendered himself liable to the drastic remedy demanded are as follows:

A libel was prepared by Messrs. Single & Single, the attorneys for the underwriters on the coal cargo of the Penn Fuel, and was sent by them on July 12th, 1928, to the coal company's place of business at Wilkesbarre, Pa., to be verified.

On July 25, 1928, Mr. Joseph McGovern, associated with the office of Mr. Rowe, telephoned to Mr. Middleton, who is associated with Messrs. Single & Single, stating that Mr. Rowe usually represented the coal company, and that, therefore, the coal company, after verifying the libel, had sent it to Mr. Rowe to be returned to Messrs. Single & Single.

Mr. McGovern also said that Mr. Rowe was the regular counsel to a Mr. Joseph O'Connor, who did business as the Penn Fuel Company and was the owner of the barge Penn Fuel, and that Mr. Rowe would promptly return the libel to Messrs. Single & Single with a notice of appearance.

On July 30, 1928, Messrs. Single & Single received a letter from Mr. Rowe's office, dated July 28, 1928, reading as follows:

"Single & Single, Esqrs., No. 15 William Street, New York City Attention: Mr. Middleton Gentlemen: Enclosed herewith you will please find original libel in the suit by Payne Coal Company, Inc. against the barge "Penn Fuel" and the Penn Fuel Company, which has been verified by the Payne Coal Company, Inc.; also original and copy of notice of appearance of Joseph O'Connor, doing business as the Penn Fuel Company. I understand that you will file the original libel and notice of appearance, and that in place of issuing process against the barge "Penn Fuel", we are to put up a bond in the amount demanded in the libel. I expect to have this bond in the course of a few days and will forward the same to you.

"Will you kindly send me a copy of the libel so that I may prepare the answer to the same.

"Yours very truly,
"Louis H. Rowe, per JMcG"

On July 30, 1928, Messrs. Single & Single replied as follows: "Due to your undertaking to put up a bond in the amount demanded in the libel, we do not necessarily desire you to put up this bond until we feel that we are unable to get together and agree upon a figure in settlement. If we can settle the matter your client will be saved the cost of the bond. If we cannot settle the matter, we feel secure in your written undertaking to file the bond."

The notice of appearance from the Penn Fuel Company, which was inclosed in Mr. Rowe's letter of July 28th, was returned by Messrs. Single & Single on the appropriate ground that the rules of this court require a stipulation for costs to be filed with an appearance.

Negotiations for settlement, initiated after the correspondence above set forth, failed of result, and Messrs. Single & Single, on behalf of the libelant, then demanded that the stipulation for the value of the barge be filed.

Mr. O'Connor, the owner of the barge Penn Fuel, who had authorized Mr. Rowe to give the letter of July 28, 1928, is now unwilling or unable to give any stipulation for value in behalf of the barge, and the barge itself cannot be arrested because she cannot be found.

The coal company has, therefore, instituted this proceeding as a substitute for the reg-

ular court process which they did not invoke when they could have used it to arrest the barge.

■ I do not think that Mr. Rowe's first point as to the court's jurisdiction is well taken.

By becoming a member of the bar of this court Mr. Rowe voluntarily submitted himself to its jurisdiction in respect of matters involving his professional conduct, and subjected himself to the control which the court may deem advisable to exercise over members of its bar in their professional relations. United States v. Maresca (D. C.) 266 F. 713, 719; People ex rel. Karlin v. Culkin, 248 N. Y. 465, 162 N. E. 487, 60 A. L. R. 851; United Mining and Finance Corporation, Ltd., v. Becher, [1910] 2 K. B. 296, 306, 307.

But in every controversy which comes before a court, after the court has sustained its jurisdiction over the subject-matter and the person of the defending party, two questions still remain to be determined before the complaining party can be in position to get his remedy: First, whether the court is obligated to decide the controversy, or whether the jurisdiction is discretionary and the court has the right to relegate the controversy to another tribunal; and, second, whether, if the court decides that it should retain and hear the controversy, the complaining party has made out a case entitling him to the remedy which he seeks.

■ Ruling against Mr. Rowe on his jurisdictional objection, therefore, still leaves the coal company a long way from its goal. For as a rule the courts are not hospitable to summary proceedings—although on appropriate occasions they have recourse to them—and it is always a question of discretion in motions for summary orders of this kind whether the court will entertain the motion or will relegate the moving party to a plenary suit. United States v. Maresca (D. C.) 266 F. 713, 719; United Mining and Finance Corporation, Ltd., v. Becher, [1910] 2 K. B. 296, 307.

■ The question involved here, therefore, is whether, having jurisdiction to hear this motion against Mr. Rowe, owing to his membership in the bar of this court, I should, in the exercise of a sound discretion, deal with this motion on its merits.

Whether the undertaking to give bond contained in the letter of July 28th was binding on Mr. Rowe personally I do not determine, but I venture to suggest that his personal liability is open to question for two reasons: First, on account of the wording of his letter; and, second, because in litigations, lawyers always act as agents for disclosed principals. Royal Indemnity Company v. Corn (Sup.) 162 N. Y. S. 659.

Putting the situation, however, at its worst for Mr. Rowe, and, assuming for the purpose of this motion, that by the letter of July 28th he bound himself personally to give a stipulation for value for the barge Penn Fuel, we have nothing but a contract by him to bond a vessel.

Such a contract is not maritime and would not be within the admiralty jurisdiction of this court in a plenary proceeding. The amount involved—$750—is too small to bring the matter within the jurisdiction of this court, either on its law side or on its equity side, even if the necessary diversity of citizenship exists, which does not appear.

Thus, when the coal company asks this court to issue a summary order against Mr. Rowe compelling him to implement his undertaking, it is asking a court of limited jurisdiction to do, by an extraordinary remedy—which should certainly be most sparingly used—what it could not do in ordinary course.

These questions of admiralty and federal jurisdiction are mentioned, because, when such an unusual and drastic remedy as this is sought, the result of granting it should be considered in all its implications.

I cannot, however, dispose of this proceeding on these jurisdictional points, for the question here involved is not a question of admiralty or federal jurisdiction but of the exercise of the inherent jurisdiction which this court—like all other courts—has over its bar.

There is not any doubt, of course, that a personal undertaking by an attorney to give a bond is binding on him.

But in this proceeding we are concerned only with the question of whether the remedy by which the undertaking is sought to be enforced is a proper remedy.

The enforcement of an undertaking to give security has, so far as I am aware, never come up as it does here in any of the admiralty courts of this country. Here it arises in its ultimate and most poignant form.

In re Atlantic Gulf & West Indies S. S. Line (The Agwisun) (D. C.) 20 F.(2d) 975, 1927 A. M. C. 1084, which is cited as an authority for the coal company, did not involve any mandatory action by this court. In that case Judge Thacher lifted an injunction in a limitation of liability case to permit a libelant in a salvage case in the Eastern District of New York to issue process against the Agwisun if her proctors, who had given

an undertaking for security in the salvage case, failed to file a bond therein.

The Agwisun is not any precedent for granting this motion. There Judge Thacher gave the salvage libelant a chance to get a bond. Here I am asked to make Mr. Rowe give one.

The sanction there was the process of the Eastern District, and the failure to give security would have been punished by having the Agwisun tied up.

Here the sanction would be an order directed against Mr. Rowe personally, and failure to give the security as required by the order would be punished as contempt of court.

Whilst there has been considerable difference of opinion among English judges as to the extent to which a court should use its power to issue mandatory orders to its solicitors, the English cases cited by counsel for the coal company seem to indicate that, if the situation involved here had come before an English Court, the coal company might get the remedy it seeks.

But it is interesting to note, in this connection, that in the English case most relied on as a precedent by the coal company— United Mining and Finance Corporation, Ltd., v. Becher, [1910] 2 K. B. 296—the final result was a plenary proceeding by way of interpleader.

In that case a proceeding, comparable apparently to this motion, was brought against Mr. Becher, an English solicitor, for an order compelling him to return £2,000, which had been deposited with him by the mining corporation during negotiations in which Becher was representing a client in Russia. The moneys were to be repaid if the negotiators did not come to terms by a given date. The negotiations failed before that date. Repayment of the money was demanded of Becher and refused by him on the ground that he feared trouble with his Russian client if he paid the money back to the mining corporation on its demand. When the summary proceeding for return of the money was brought against him, Becher objected to the jurisdiction of the court.

Mr. Justice Hamilton—now Lord Sumner—overruled this objection, held that the granting of such an order against a solicitor was a discretionary matter, and, after considering the facts, granted the order sought.

Becher took an appeal. It appears from the report thereof—United Mining and Finance Corporation, Ltd., v. Becher, [1910] 1 K. B. 840—that, after the argument had proceeded for some time in the Court of Appeal, it was arranged between the parties that Becher should be allowed to file an interpleader, and thus have a plenary remedy which would more effectually protect him against his Russian client than Mr. Justice Hamilton's order in which Becher's client had not been cited.

The questions of law and fact which had come before Mr. Justice Hamilton were, therefore, not passed on by the Court of Appeal. When, however, one has seen the English courts in action, it is not hard to read between the lines of the report of the argument on appeal, and I have not any doubt that the arrangement between the parties for the interpleader, there mentioned, was the result of remarks dropped by the Lord Justices expressing their preference for plenary remedies in such circumstances.

But whatever may be the prevailing tendency in England, the decisions in the New York state courts show that the order sought here would not be granted by a New York court.

In a question of this kind involving the internal relations between a federal court sitting in New York state and the members of its bar, I think it is wise to follow the New York decisions, because most, if not all, of the members of the District Court bar are, like Mr. Rowe, members of the New York bar.

Courts, of course, have from ancient times exercised control by general and special orders over attorneys admitted to practice before them. This control, as we have seen by a recent New York case, extends even to the power of general inquisition into the acts of attorneys in their professional relations. People ex rel. Karlin v. Culkin, 248 N. Y. 465, 162 N. E. 487, 60 A. L. R. 851.

Such inquiries and all disbarments are, of course, plenary proceedings.

But a summary proceeding for an order against an attorney is an extraordinary and drastic remedy, and the use of it has been very strictly limited in the New York state courts to cases where the attorney has wrongfully retained money received in his professional capacity for the client.[1]

The reason for this was pointed out by Mr. Justice McLaughlin in Minnesota Phonograph Co. v. Tomlinson, 148 App. Div. 56, where he said at page 60, 132 N. Y. S. 1063,

---

[1] Another purpose indicated by Judge Hough, for which a summary order may appropriately be issued against an attorney, is to compel return of papers to a person from whom they have been unlawfully taken. United States v. Maresca (D. C.) 266 F. 713.

1066, affirmed on opinion below, 212 N. Y. 574, 106 N. E. 1035: "One does not forfeit any of his rights by becoming an attorney at law. He has the same rights thereafter that other persons have, which includes the right to have asserted claims against him established in the regular and ordinary way, that is, by action, except only in the case where the claim is for money received for his client while he is acting as an attorney at law for him."

The case of Bailey v. Rutherford, 242 N. Y. 220, 151 N. E. 213, admirably illustrates how strictly the New York courts limit the use of summary orders against attorneys. There an attorney of New York state had sent a client's claim for collection to an attorney in another state; the latter had collected the claim, and, according to the client's contention, had deducted too large a fee from the money collected before remitting it to the New York attorney. The Court of Appeals held that, as the New York attorney had never received this money, a summary remedy by order would not lie against him.

Judge Pound, in quoting with approval the statement of Justice McLaughlin above set forth, said, 242 N. Y. at page 223, 151 N. E. 213: "The summary proceeding rests upon misconduct clearly established on the part of the attorney in retaining the client's money. In all cases the client has relief in the ordinary tribunals for the determination of legal controversies and where his right to have a summary order can be reasonably questioned he must be referred to the ordinary remedies."

The same principle is laid down in Bowling Green Savings Bank v. Todd, 52 N. Y. 489, 493, and Sigmund Contracting Co. v. Montegriffo, 153 App. Div. 374, 138 N. Y. S. 510.

Under the New York practice it is, therefore, the settled rule that a summary order must be based on the fiduciary relationship of attorney and client between the parties to the proceeding.

Here there is not any fiduciary relationship involved. The parties were dealing at arm's length as opposing proctors in an impending suit in admiralty.

The proctors for the coal company, the proposed libelant, chose to accept an undertaking for a bond instead of using the ordinary process of this court by which the vessel to be sued could have been arrested. Now, finding their bargain unsatisfactory, they ask for an extraordinary remedy.

There is not any element of professional misconduct involved in Mr. Rowe's attitude

that he is not personally liable on the undertaking for security. There merely exists a difference of opinion between him and the coal company as to the legal effect of the letters exchanged between them as above described.

To grant a summary order against Mr. Rowe under these circumstances would be an abuse of discretion.

For a decision as to Mr. Rowe's personal liability on the undertaking for security the coal company must, therefore, look to some plenary action elsewhere.