## In re Herbert W. Salus

*C. Brewster Rhoads,* for Committee of Censors.

*John P. Connelly,* for respondent.

PER CURIAM, April 15, 1935.—This rule comes before us under the following circumstances:

On May 31, 1934, the judge of the common pleas, who had been regularly assigned to the trial of cases in the courts of oyer and terminer and quarter sessions, called the attention of the chancellor of the Philadelphia Bar Association to certain improper practices indicating a disgraceful relationship between organized crime and members of the bar, and suggested that a committee of the bar association be appointed to conduct an investigation of the subject.

The board of governors of the bar association accordingly authorized the appointment of such a committee. Upon its petition the appointment was approved by the court, the committee being thereby, under the provisions of the Act of June 12, 1931, P. L. 543, empowered to issue subpœnas and administer oaths.

There is ample precedent for this course both in our own experience, and elsewhere. A few years ago a similar investigation was made by a committee of the

bar of practices in connection with negligence cases, resulting in the correction of great evils, and the enactment of court rules which have since regulated the subject. A similar proceeding was had in New York and received the approval of the Court of Appeals. See State of New York, ex rel., v. Culkin, 248 N. Y. 465, 60 A. L. R. 851.

On February 1, 1935, the report of the committee, with a summary of testimony taken in the investigation, was submitted to the board of judges who thereupon entered the rule upon the respondent which is now before us, and fixed a time and place for a hearing thereon. Similar rules were entered upon seven other members of the bar.

Before taking up the discussion of the instant case it is only proper and due the bar as a whole that we should refer to part of the report of the committee where it says: "In conclusion the committee is gratified to be able to express the belief that this whole matter of improper practices in connection with criminal cases appears to be confined to a relatively small number of members of the criminal bar."

This finding comes with especial force in view of the thoroughness and extent of the investigation made by the committee. It is a finding which is confirmed by our own observation, which we too are gratified to learn is corroborated by the committee's investigation.

The rule entered upon the respondent was to show cause why he should not be disciplined for the unprofessional conduct recited in the preamble to the rule.

This conduct was, in brief, that he had entered into understandings with persons, known to be members of criminal organizations engaged in unlawful gambling, to represent them and their subordinate agents if and when any of them should thereafter be arrested and charged with violations of the laws against gambling, and that he did, in pursuance of such understandings represent such agents and act for them professionally and receive pay for such professional services from the principals of the criminal organizations.

The preamble also charges, that having formed wrongful and unprofessional alliances and understandings with members of the police department in certain districts and station houses, whereby he was given information in advance of others of the arrest of persons charged with the offense of driving automobiles while under the influence of intoxicating liquor, and before such arrests and charges were made a matter of station house record; and also was given advance access, by himself or his agents, to such persons for the purpose of enabling him to secure employment by such persons as their attorney, thereby securing favors and precedence by which he was enabled to obtain business in professionally representing great numbers of such persons, and to obtain unduly favorable results for such clients, all of which was made possible and was due to said police alliances, preferences and favors, to the detriment and obstruction of the administration of justice and the operation of the laws for the protection of the public in the use of the highways of the State, and against good morals and the ethics of the profession.

It will be observed, with regard to the first count in the above accusation, that the respondent is not charged merely with allowing himself to be retained to defend a person charged with crime, nor is he charged with permitting himself to be paid for his professional services by someone other than the defendant. These acts are entirely lawful and ethical. It was his right and might even become his duty to appear for a defendant, and he might lawfully receive his fee from either defendant or a third party who was willing to pay it. These are not the charges.

They are the acceptance of retainers from the leader of a criminal conspiracy, not to defend a man already arrested for a crime that has been committed, but to represent and defend agents of the principal who might in the future, from time to time, be arrested for crimes to be committed in carrying out the conspiracy. Such an agreement, to stand ready to defend future crimes, amounts to an agreement to encourage the agents to go on with the conspiracy. It promises comfort to the criminal, and makes his pathway as easy and safe as circumstances will permit. Relying upon the agreement the principal can promise to his agents the quick entry of bail, and a legal defender whenever they are arrested. The offense in such cases is not the receipt of the fee, but the furtherance of the illegal purposes of the conspiracy by the removal of difficulties from the path of the criminal and by giving him aid and comfort in the course of his crime, while at the same time shielding the principal and covering his connection with the arrested agent.

We have no doubt that an attorney who accepts such a retainer is as much a principal in the conspiracy as is the "banker" who retains him, or the "pick-up" man, or "writer" who gets the benefit of the agreement.

An attorney so acting could properly be indicted as a principal in the crime.

There can of course be no question of the professional impropriety of such conduct. Nor need there be any refinement of reasoning concerning his criminality, immorality or unethical conduct.

The principal question in this connection is that of proof that may be required to sustain such a charge.

We conceive it clear that an admission of acceptance of a retainer, periodically paid, to defend persons, when, if and as they may be arrested for acts to be done in carrying out a criminal conspiracy, is ample proof not only of professional impropriety, but, as we have said, of actual participation in the crime.

So too, is proof of the acceptance of a standing credit from the principal for fees for the defense of his agents.

Direct proof of this is perhaps hard to obtain, and is rarely to be expected. But the fact, like any other, is capable of proof by circumstantial evidence. If, for example, the proofs disclose that in numerous cases an attorney is shown to have acted for an accused agent, who did not retain him, and who did not know he was retained, did not know who secured his release or bail, and who paid neither the attorney nor anyone else for the legal services at the hearing or at the trial, nor who secured bail for him, and when it further appears that no friend or member of the defendant's family retained the attorney, and that no fee is paid or demanded from the accused, the inference may properly be drawn that the connection of the attorney with the case is the result of some illicit arrangement to which he was a party. Especially, where in addition to what we have said no explanation is given by the attorney for his connection with the case.

The repeated happening of such incidents justifies the inference of a preexisting plan.

With respect to the respondent Herbert W. Salus, Esq., 12 persons were called as witnesses, who were subordinate agents of lottery backers. They were Roy Washington, John Munyon, John Hayes, Benjamin Visnov, Coston Harmon, Michael Galdri, Dolphus Odom, Casenia Reynolds, Earl Reynolds, Walter Coleman, Gus Harris and David Povernick.

These persons had all been arrested charged with complicity in the "numbers game" as "writers" or "pick-up men", i. e., subordinate agents.

They testified that when arrested they were released on copies of the charge secured by persons unknown to them, that bail was procured by persons

unknown to them and that they were sent by their backers to the Salus office for representation. They were, in fact, represented by the Salus office and at no time were they requested by anyone in that office or connected with it to pay a fee, and in fact no fee had been paid. A number of these defendants stated that they were represented by someone from the Salus office at the magistrate's court, and in the quarter sessions.

Many of the witnesses gave a definite statement of the manner in which the Salus office represented them and the method by which the Salus office was retained.

John Hayes testified that he was a pick-up man, employed by Tom Matthews, to pick up the slips from various writers. The slips would be turned in to him and he then turned them over to Tom Matthews. After his arrest, he was released on a copy of the charge procured by a bondsman named Schwartz from Herbert Salus' office. The witness stated that the copy was procured at the request of Matthews, the backer. At his hearing before a magistrate he was represented by Herbert W. Salus. He said that he, Hayes, did not retain Salus, but that Matthews, his backer, did. Mr. Salus did not ask him for a fee and he paid none. The witness was discharged by the magistrate on this occasion. He was later rearrested on a bench warrent issued in the quarter sessions in May of 1934. On that occasion he was represented by Albert P. Goldberg, an attorney employed by respondent, to whom he paid nothing.

Visnov was arrested for participation in the numbers racket. A ticket for the arena was left at his garage with the address of the Salus office on the reverse side, and he was told to go to that office. Visnov went to the Salus office and, finding no one there, was about to leave. He was called back by Herbert W. Salus. He showed Mr. Salus the ticket, and said, "Here is a ticket with your address; what am I supposed to do with it?" Mr. Salus thereupon called Mr. Goldberg, and sent him to court. Visnov was not asked to pay a fee by Salus or Goldberg and he did not retain either one of them. The same procedure as to release on a copy of the charge and release on bail by persons unknown to him applied in this case.

Coston Harmon was arrested for a numbers violation in November 1933. Harmon was writing numbers. The usual release on a copy and bail followed his arrest, all without his knowledge. He was represented at the hearing before the magistrate by Mr. Goldberg from the Salus office. His case was called for trial and Mr. Goldberg appeared for him in court. This man had been arrested in 1932 on a similar charge, and on that occasion he had also been represented by an attorney from the Salus office. On neither occasion was he asked to pay a fee. The trial list shows Herbert W. Salus' appearance for the defendant, and the witness identified him as his attorney.

John Munyon was arrested in January of 1934. He testified that he was writing for a house in West Philadelphia. When his case was tried in room 676, he was represented by Herbert Salus. On the evening of the arrest the man he knew as the "pick-up" man told him to go to the Salus office in the Morris Building. The witness went there, and, after waiting some time, was sent by the stenographer to court where he saw Herbert Salus. When the defendant's case was called before the magistrate, he said that Herbert Salus walked up as his name was called out, and represented him. Mr. Salus also appeared for him in room 676 when he was tried. He was not asked by Mr. Salus to pay a fee on either of these occasions, and he paid no fee at any time for the services of an attorney.

Walter Coleman was arrested in February of 1934. When his case was called for trial, an attorney whom he did not know appeared for him. He stated that this attorney did not ask him for the payment of a fee and that he did not pay a fee. An examination of the trial list shows the appearance of Herbert W. Salus.

Roy Washington was arrested in February of 1934. He admitted he was writing numbers, and stated that when his case was called for trial, Albert P. Goldberg appeared for him; that Mr. Goldberg did not ask him to pay a fee, that he paid no fee, and that he did not retain Mr. Goldberg.

Earl Reynolds and Dolphus Odom were arrested for numbers violations. They were represented by an attorney before the magistrate, sent by the banker, John Carter. When their cases were called for trial in City Hall, the same lawyer, Albert P. Goldberg, represented them; Mr. Goldberg did not ask for the payment of a fee, and none was paid by the witnesses. Neither of these defendants had retained the services of Mr. Goldberg.

Gus Harris was arrested in January of 1934. He received a notice from a person unknown to him to go to City Hall for trial. This person told him Mr. Salus would be there. A Mr. Salus did represent him. He asked no fee. The witness, however, could not identify the respondent or his brother or Mr. Goldberg.

Michael Galdri was arrested for numbers violations on three occasions. He testified that he was writing numbers. On the first two occasions he was discharged, and on the third he was held for court. He was represented by Herbert W. Salus when his case was tried. He had not retained Mr. Salus, was not asked to pay a fee and did not pay a fee. He does not know who procured the services of Mr. Salus for him; he, the defendant, did not pay Mr. Salus a fee.

Oliver Price was arrested in March of 1934; he denied any connection with the numbers game other than that he played numbers. When his case was called for trial, he was represented by Mr. Goldberg, whom he had not retained and to whom he paid no fee, nor was he ever requested by Mr. Goldberg to pay a fee.

Mr. Herbert W. Salus testified that he and Goldberg had charge of most of the numbers cases that came into their office, and that he made most of the arrangements for the payment of fees. When asked as to whether his office represented any of the so-called "higher-ups" in the numbers game, he said they had represented Baron in connection with numbers matters a year and a half or 2 years ago; that during the last year he recalled representing half a dozen persons for whom Baron paid the fees, but that he could not remember their names, nor had his office any record of them. He said that when defendants came in and said they had no money, but were formerly employed by Baron, he always called up a certain telephone number, asked for Baron and received word that Baron would pay the fee, which he did. He said his firm had represented the two Matthews brothers, Frank and Tom, in their personal business, but that they had never collected fees from them for representing any of their subordinates. He admitted representing a man named Lallie who was a "higher-up" in the number racket. He denied ever going into court for people whom he did not know, or without their request. He admitted representing a man named Visnov out of charity. He also said that he had represented in the last 2 years 75 or 100 colored people whose backers had deserted them before trial. He said that his office would invariably ask for a fee unless he was told beforehand by the person sending the defendant that he would be responsible for the fee or that the defendant could pay a fee. He admitted that from time to time he went in and appeared for defendants without having a fee paid and

that sometimes Mr. Goldberg did so, but that this was usually in order to protect the bondsman whose bail might otherwise have been forfeited. He testified with regard to Washington that he knew nothing about Washington at all, that he was represented by Goldberg. The latter had told the committee that he did not remember representing the man. Before the court he said he recollected defending one Pendergast jointly indicted with Washington, and that one or the other paid the fee. He made no statement about how he came to represent either. Mr. Goldberg also admitted representing for the Salus office the two Reynolds, and Odom, but gave no explanation of his employment by them, nor any statement as to who paid the fees.

With regard to John Munyon, the respondent, H. W. Salus, told the committee he did not remember him. In court he testified that a "committeeman or some political worker" asked him to represent the defendant. He did not give the name of the committeeman. He said he received no fee.

The respondent could not remember appearing for John Hayes at his first arrest, although a bondsman of the Salus office entered bail, and promised to have Mr. Salus at the hearing, and Mr. Salus did attend the hearing. Mr. Goldberg represented him at the second hearing. The latter gives no explanation either of his retainer or failure to charge a fee.

With regard to Visnov, Mr. Salus says in effect that he represented him out of charity.

As to Harmon, he represented him at the request of "some fellow", "a great big fellow", who paid him $25.

As to Galdri, the respondent says he does not remember representing him.

Povernick he says he represented out of charity because he happened to mention one Smith who was a boyhood friend of the respondent, and that he sent Goldberg over to represent him.

The respondent testified that he does not know Harris and never represented him.

Is there sufficient evidence to connect the respondent with the illicit receipt of fees? A dozen of the humbler criminals have sworn that after their arrest bail was entered for them, and they were represented by respondent without cost. Indeed it is highly probable that the ordinary cost of such services was beyond the means of any of them. Their unlawful work was hazardous and their pay little. None but the most needy would undertake it. The usual cost of bail was 10 percent of the amount required, that is from $30 for a $300 bond, to $70 for a $700 bond; and the attorney's fees ran from $25 to $75. The witnesses did not know who secured their release or defense. It is fair to infer that no relative or friend came to their rescue, or after their release the accused would have learned who it was. On the other hand the Salus office, which was in contact with the three backers we have named above, appeared in defense. We think the inference legitimate that it was the backers who defended their subordinates. Certainly the burden is upon the respondent to tell how it was he came to act, without fee or reward from his clients. In our opinion he has not done so. He denies in some of the cases that he represented the witnesses. He says that third parties retained him in others. He does not call a single person to corroborate him, and he apparently does not even know the names of the persons who retained and paid him. "A committeeman" retained him in one case. He neither names him nor calls him. "A big fellow" retained him in another. Some he defended out of charity. They testify to the contrary. One man he defended because the accused happened in conversation to fix the locality of something he was talking about as near "Smith's fish store", and respond-

ent had known Smith. The client's testimony is to the contrary. Such explanations are in our opinion unsatisfactory and insufficient. They are not convincing, and we regret to say we think most of them are untrue. We conclude that there is more than coincidence between the fact that the respondent's office represented the three backers, and the fact that the Salus office took care, without cost to them, of the underlings, in some cases identified as underlings of the backers named.

It appeared in the testimony before the court that Herbert W. Salus was a member of the Civil Service Board, a commission which has general supervision over the police force. It is provided in article XIX, sec. 18 of the Act of June 25, 1919, P. L. 581, the "New City Charter," that "No police officer or fireman . . . shall be removed or discharged, except for cause, upon written charges, and after an opportunity to be heard in his own defense. Such charges . . . shall . . . be heard, investigated, and determined by the commission. . . . The finding and decision of the commission . . . shall be certified to the appointing authority, and shall be forthwith enforced by such authority."

In other words the position and livelihood of policemen are dependent upon the decision of this commission of which the respondent Herbert W. Salus is a member.

There is probably no case in the criminal courts in which one or more policemen do not appear, generally as witnesses against the defendant. The respondent's practice is almost wholly in the criminal court, where, nearly always, he appears for the defense. One of the charges against his firm involves the corruption of a policeman. As a commissioner his duty would be to try this man. He says he would decline to sit, but the incident only emphasizes the incompatibility of his office as commissioner and his office as attorney. He testified that he could not know what a policeman-witness would have in mind if he were called to testify against the commissioner's client. We think we do know that the policeman-witness would be loath to antagonize the commissioner-attorney, upon whose decision the officer's position and living depended. We can well imagine a lack of enthusiasm in the witness in such a situation. We need not make any fine distinctions as to whether the respondent's conduct is unlawful or unethical. It certainly belongs to the class of acts described as things that are "not done" by fine-thinking people or respectable lawyers. This subject is not in the bill of particulars of the rule, and we do not base our action upon it. We refer to it only because the respondent himself brought it out by his protest that he would not sit in judgment on the offending officer who notified the Salus office through Blasband of the lucrative drunken drivers' cases.

Another incident was brought out by the respondent, strangely enough as defense to his relations with magistrates.

It was this: The respondent testifying was asked about his relationship with magistrates. Mr. Herbert W. Salus said: "If a case came before some of the magistrates that I was friendly to and he was in a position to say yes or no to my request, and if it came before many of the judges that I know, and they were in a position to say yes or no to a situation, and there was nothing wrong, I would expect them to say yes where they might say no to somebody else. The only exception I know to that rule was in one particular case where I had a receiving stolen goods case before a man named Medway, who was my friend, whom I, and not the senator, had made a magistrate. The history of it is that 4 years ago when the campaign was planned, when Moore was elected, I suggested the name of Moore and Kelly, when the slate was made up, and I got

Mr. Medway put on as magistrate as my candidate. About a year or two years ago in the summer months I had a case before Medway for receiving stolen goods. There was nothing upon which the defendant should be held for court, but it was a case that arose out of a matter where a policeman or somebody else had been killed, and I got Medway, called him before the hearing and said, 'Charley, there is nothing in this case upon which to hold this defendant, but I can beat it in court and by reason of my relations with you I cannot ask you to discharge, I am going to stand out there and battle my best to get him discharged, but, on account of the gravity of the case, hold him for court.' The man was held and the case was tried."

That is to say the respondent testified that in order to give an appearance to the public that the magistrate was independent, and free from any desire to favor the respondent, he asked him to hold the accused for trial, notwithstanding there is no evidence to sustain the charge and notwithstanding the fact that the magistrate ought in right and justice to discharge the accused. To strengthen the appearance of independence he tells the magistrate that he, the respondent, will make a show of strenuous defense, but he instructs the magistrate to ignore this gesture and to hold the defendant for trial. This the magistrate does. All this is done to prove the magistrate's independence of the respondent. Could there be any stronger evidence of exactly the contrary? Had the accused no right which his counsel was bound to insist upon? Or were his liberty and character to be sacrificed to give the respondent and his friendly magistrate an opportunity to make a false show of independence?

The extraordinary feature of this incident is that the respondent evidently regards his conduct as meritorious. And still more extraordinary is it that he seems to think that it proves the independence of the magistrate whereas, on the contrary, it only shows the latter's subservience to the respondent's suggestions, indeed to his highly improper suggestion that an innocent client should be held in bail for a crime in the face of inadequate proof.

On the subject of the second count in the preamble to the rule, that of unprofessional alliances with the police by which cases involving charges against drunken drivers were diverted to the Salus office, the respondent and his partner Samuel W. Salus were jointly concerned.

We have discussed this subject in our opinion in the case against Samuel W. Salus. What we there said about the latter's connection with this subject may also be said about that of the respondent, Herbert W. Salus. The same evidence and reasons apply to both. We will not repeat them. But for the reasons there given we find that the respondent Herbert W. Salus has been guilty of unprofessional conduct in his dealings with the police in connection with these cases.

In view of all the foregoing the court enters the following decree:

### Decree

And now, April 15, 1935, upon consideration of the rule entered by the court, and after hearing thereon, it is ordered that the rule be made absolute, and that the said respondent Herbert W. Salus be, and is hereby disbarred from practicing at the bar of the courts of Common Pleas, Orphans' Court, and the Municipal Court of the County of Philadelphia, and that his name be stricken from the roll of attorneys.

Notice of this order to be given by the prothonotary of the Court of Common Pleas to the Supreme and Superior Courts of Pennsylvania, the several courts of Common Pleas, the Orphans' Court, and the Municipal Court of the City and County of Philadelphia.