RUCKENBROD v. MULLINS et al.

No. 6498.   Decided January 19, 1943.   (133 P. 2d 325.)

See 5 Am. Jur., 280; 32 C. J. S., Evidence, sec. 766.

*Harold E. Wallace,* and *Ray Van Cott, Jr.,* both of Salt Lake City, for appellants.

*F. Henri Henriod,* of Salt Lake City, for respondent.

WOLFE, Chief Justice.

The respondent, Richard Ruckenbrod, an attorney duly licensed to practice in the State of Utah, was appointed by the City Court of Salt Lake City to defend an indigent defendant, Theodore Pacheco, on a charge of second degree burglary. Ruckenbrod appeared before the City Court at a preliminary hearing, interviewed Pacheco several times, and represented him at the trial in the District Court. At the close of a one day trial, the District Judge ordered Salt Lake County to pay Ruckenbrod $75 for services rendered in the defense of Pacheco. When Salt Lake County refused to comply with this order, Ruckenbrod filed a petition for a writ of mandamus to compel compliance therewith. The County interposed a demurrer to the petition for the writ which demurrer was duly overruled. The County elected to stand on the demurrer whereupon judgment was entered and this appeal results.

Both parties to this action have indicated that they would like us to decide whether or not a duly licensed attorney appointed by the court to defend an indigent accused is entitled to payment for his services from the County in which the appointment and the defense were made. Under the view we take of the case, this is the only question which need be decided.

This identical issue was before us in *Pardee* v. *Salt Lake County*, 39 Utah 482, 118 P. 122, 36 L. R. A., N. S. 377, Ann. Cas. 1913E, 200. We there held that in absence of express statute to the contrary, an attorney, appointed by the court to defend an indigent defendant, was not entitled to payment for his services from the County. This holding is in accord with the overwhelming weight of authority. See annotation in 130 A. L. R. 1439; 5 Am. Jur. p. 354, Sec. 157, and cases cited and discussed in the Pardee case.

The respondent frankly admits that the Pardee case favors the position of the appellant. However, in view of some recent cases, especially the case of *Knox County Council* v.

*State*, 217 Ind. 493, 29 N. E. 2d 405, 408, 130 A.. L. R. 1427, counsel for both sides state candidly that they seek to know whether or not this court still adheres to the rule set down in the Pardee case. We have, therefore, consented to re-examine the basis for that rule.

The Knox County case, supra, following a long line of Indiana cases, many of which are discussed in the Pardee case, held that even in the absence of a specific statute, attorneys appointed to represent indigent defendants in criminal proceedings are entitled to compensation from the public. It is upon the reasoning of these cases that the respondent relies. The reasoning of the Knox County case is summarized by the court as follows:

"* * * from the earliest times, this court has held that to require the services of an attorney to prosecute and defend without fee is in conflict with section 21 of article 1 of the Constitution of Indiana. *Blythe* v. *State*, 1853, 4 Ind. 525; *Webb, Auditor, etc.*, v. *Baird*, 1854, 6 Ind. 13.

\*  \*  \*

"This court has consistently held that, under the Constitution of Indiana, *there can be no valid judgment against a defendant in a criminal case unless he has been offered, and, if so desired, provided with adequate, counsel.* \* \* \*

"It seems to be the universal rule that 'A court has the inherent power and authority to incur and order paid all such expenses as are necessary for the holding of court and the administration of its duties.' 14 American Jurisprudence, § 171, p. 371. \* \* \*

"The conclusion seems unavoidable that it is the duty of courts to see that criminal cases are tried; that these cases cannot be legally tried unless the defendant, if he is a pauper, is provided with counsel; that attorneys cannot be compelled to serve without compensation; and therefore that, in order to conduct a legal trial, the court must have power to appoint counsel, and order that such counsel shall be compensated if necessary; and that the right to provide compensation cannot be made to depend upon the will of the Legislature or of the county council."

It is obvious that one of the basic concepts upon which the opinion proceeds is that, because of the Constitution of

Indiana, a member of the bar cannot be compelled to render services in defense of a pauper without compensation.

The majority of jurisdictions hold that an attorney is an officer of the court with many rights and privileges, and must accept his office cum onere. One of the burdens incident to the office, recognized by custom of the courts for many years, is the duty of the attorney to render his services gratuitously to indigent defendants at the suggestion of the court. *Nabb* v. *United States,* 1 Ct. Cl. 173; *Rowe* v. *Yuba County,* 17 Cal. 61; *Johnston* v. *Lewis & Clarke County,* 2 Mont. 159; *People ex rel. Whedon* v. *Board of Sup'rs, Washington County,* 192 App. Div. 705, 183 N. Y. S. 438; *People* v. *Culkin,* 248 N. Y. 465, 162 N. E. 487, 60 A. L. R. 851; annotation 130 A. L. R. 1439; 5 Am. Jur. Sec. 157, p. 354; Cooley's Constitutional Limitations, 8 Ed., Vol. 1 p. 700.

Although the holding of the Indiana court, that an attorney cannot be compelled to render his services gratuitously, is based upon a Constitutional provision, the language used in the cases indicates that the court would probably have reached the same conclusion even in the absence of the Constitutional provision. In fact, in discussing the case of *Webb* v. *Baird,* supra, in the Pardee case, we concluded that the decision was not based on the Constitutional provision. In the Knox County case the court said:

"The Legislature may in the future require the licensing of restaurant operators and grocers as a sanitary police measure. If a law should be enacted requiring every person licensed by the state to render services, or furnish the materials of their business, to paupers gratuitously, much difficulty would be found in justifying a decision holding the law unconstitutional as depriving the green grocer or the restaurant operator of his goods, or as depriving the physician, or the barber, or the plumber, or the electrician, or the mechanical engineer of his services, without compensation, while adhering to a rule that licensed attorneys' services may be taken without compensation. Although the rule announced is contrary to the weight of authority, we are convinced of its soundness."

No doubt the Knox County case is correct in the observation that doctors, plumbers, barbers, etc., could not be compelled to render gratuitous services to the destitute merely because they were licensed by the state. The power of the state to license does not ordinarily include the power to impose such obligations. By the same token the mere fact, in and of itself, that attorneys are licensed should not be sufficient reason for holding that a court can compel attorneys to render services gratuitously to indigent defendants although some courts (*Johnson* v. *Whiteside County*, 110 Ill. 22; *Simmons* v. *State*, 12 Mo. 268, 49 Am. Dec. 131) seem to so hold. These cases held that a license to practice law is a mere naked grant of a privilege without consideration, and that the state make revoke it or impose such conditions upon its exercise as are deemed proper or demanded by the public interest. But it is difficult to see why this reasoning would apply to the licensing of an attorney and yet not apply to the licensing of a doctor, plumber, barber, etc. While the right of personal liberty and the right to earn a livelihood in any lawful calling are subject to the licensing power of the state, a state cannot impose restrictions on the acceptance of the license which will deprive the licensee of his constitutional rights. 33 Am. Jur., Sec. 20, p. 341. If states have the power to impose the duty to render gratuitous services on the license of an attorney, that power must be based on more than the mere right of the state to license. Those cases which hold that the duty of gratuitous service is correlative to special rights and privileges which have been conferred upon the attorney seem to proceed on firmer ground. The Indiana court, however, maintains that these so-called privileges are more imaginary than real. In *Webb* v. *Baird*, supra, the court stated that attorneys do not have special privileges or rights conferred upon them in Indiana; that there is no reason to place attorneys in a class by themselves so that they alone of all professional men may be required to render services gratuitously to the indigent; and that the supposed rights

and privileges are slender in proportion to the reciprocal obligations of the profession to the body politic. The issue is thus well defined.

Historically there can be little doubt that the attorney who represented a client before the courts did enjoy special rights and privileges. The historical growth of the right of an attorney to practice before the common law courts in England is developed by the Supreme Court of Illinois in the case of *In re Day et al.*, 181 Ill. 73, 54 N. E. 646, 649, 50 L. R. A. 519, the court there said:

"Originally, no one could appear by attorney without the special warrant of the king, issuing out of chancery or under seal, granting the privilege. The king was considered the fountain of justice, and, as he could not in person decide all controversies and remedy all wrongs, the injured parties were referred to the proper forum, and writs were framed in his name to his judges. Suits were begun in that way, and when he granted the privileges in question it was as a part of that system, and not in a legislative capacity. In a civilized country, where the rights of persons were to be determined in accordance with established rules, either statutory or promulgated by the courts, *the employment of persons acquainted with those rules became a necessity, both to the parties and the court.* Persons unlearned in the law can neither aid a litigant nor the court, and parliament, at different times, extended the right of the litigant to appoint an attorney to represent him in court. Maugh, Attys. Append. 6, 7. In 1292, Edward I made an order by which he appointed the lord chief justice of the court of common pleas and the rest of his fellow justices of that court, that they, according to their discretion, should provide and ordain from every county certain attorneys and apprentices of the best and most apt for their learning and skill, who might do service to his court and people, and those so chosen only, and no other, should follow his court and transact the affairs thereof; the said king and his council then deeming the number of seven score to be sufficient for that employment, but it was left to the discretion of the said justices to add to that number or diminish it, as they should see fit. 7 Pol. & M. Hist. Eng. Law, 194; Dugd. Orig. J. 141. The profession of attorney was placed under the control of the judges, and the discretion to examine applicants as to their learning and qualifications, and to admit to practice, was exercised from that day by the judicial department of the English government, and no legislation sought to deprive the court of the power in that respect, or to invest it in any other branch of the government." (Italics added.)

The court in some detail then discussed the various early English Statutes relating to admission to practice; the function of the Inns of Court; and the role of "solicitors" and "barristers;" and concluded that:

"The function of determining whether one who seeks to become an officer of the courts, and to conduct causes therein, is sufficiently acquainted with the rules established by the legislature and the courts, governing the rights of parties and under which justice is administered, pertains to the courts themselves.   *   *   *   The order of admission is the judgment of the court that he possesses the requisite qualifications, under such restrictions and limitations as may be properly imposed by the legislature for the protection and welfare of the public.  The fact that the legislature may prescribe the qualifications of doctors, plumbers, horeshoers, and persons following other professions or callings, not connected with the judicial system, and may say what shall be evidence of such qualifications, can have no influence on this question.  A license to such persons confers no *right to put the judicial power in motion or to participate in judcial proceedings*.  The attorney is a necessary part of the judicial system, and his vocation is not merely to find persons who are willing to have lawsuits.  He is the first one to sit in judgment on every case, and whether the court shall be called upon to act depends on his decision."  (Italics added.)

In 2 Holdsworth's History of English Law 490, in discussing the great expense entailed in becoming a serjeant-at-law in England, it is stated:

"But if we may believe Fortescue, the outlay was profitable. 'Neither is there any man of Lawe,' he says, 'throughout the universal world which by reason of his office gaineth so much as one of these serjeants.' Chaucer's serjeant was a 'gret purchasour.' The fees paid to them were larger than, possibly double, those paid to an apprentice or attorney.  As we have seen, to become a serjeant was a condition precedent to becoming a judge.  Until the last century they had a monopoly of practice in the court of Common Pleas, and, perhaps at one period, in the court of the Marshalsea."

Again in Vol. 6, pp. 435, 436, Holdsworth states:

"The courts of the King's Bench and Common Pleas had from the first, each admitted its own staff of attorneys, and the Exchequer seems to have had a staff of clerks who acted as attorneys. No doubt

the same persons often acted as attorneys both in the Common Pleas and in the King's Bench—this is shown by an order of 1564, which attempted in vain to suppress this practice. But it is obvious that the necessity for separate admission in each court emphasized the fact that attorneys were the officers of that court; and the same fact was still further emphasized by orders for their constant attendance in their respective courts, and by their possession of the same privileges of exemption from public service, and immunity from suit, except in their own court, as the other officials of the various courts enjoyed."

Holdsworth, Vol. 2, p. 491, further points out that these early privileges were not given to attorneys without burdens. Serjeants-at-law from the very early period were required by the court to plead for a poor man for

"* * * in the Bills of Eyre (S. S.) no 25. (1292) there is a request by the plaintiff that the court will 'grant them a serjeant' for that they are poor folks."

From the quotations from Holdsworth, supra, we see that attorneys were often required to be in constant attendance in court.

In *People* v. *Culkin,* 248 N. Y. 465, 162 N. E. 487, 490, 60 A. L. R. 851, Ch. J. Cardozo traces the history of the power of the courts to make general inquiries into the conduct of its own officers, the members of the bar, and concludes that at a very early date the courts exercised rigid control over the professional conduct of members of the legal profession. He states:

"Thus, by section I of an order made in Michaelmas Term 1654, by the Court of Common Pleas, as well as by a like order of the Court of Upper or King's Bench, attorneys were required to give notice of their chambers of habitations 'under pain of being put off the roll;' no one under like penalty, was to practice in another's name, nor was any one knowingly to permit another to practice in his name, excepting in warrants of attorney for common recoveries; 'for the prevention of maintenance and brocage, no attorney was to be lessee in an ejectment nor bail for a defendant in this court in any action.' Cooke's Rules, Orders and Notices of the Courts of Common Pleas and King's Bench, Michaelmas Term, 1654."

Such duties and others are placed upon attorneys on the theory that attorneys are officers of the court. In speaking of these duties Cardozo further says in *People* v. *Culkin,* supra:

" 'Membership in the bar is a privilege burdened with conditions.' *In re Rouss,* supra, 221 N. Y. [81], page 84, 116 N. E. [782], 783. The appellant was received into that ancient fellowship for something more than private gain. He became an officer of the court, and like the court itself, an instrument or agency to advance the ends of justice. His cooperation with the court was due, whenever justice would be imperiled if co-operation was withheld. He might be assigned as counsel for the needy, in causes criminal or civil, serving without pay. Code Crim. Proc. § 308; Civil Practice Act, §§ 196, 198. He might be directed by summary order to make restitution to a client of moneys or other property wrongfully withheld. *In re H........,* 87 N. Y. 521. He might be censured, suspended, or disbarred for 'any conduct prejudicial to the administration of justice.' Judiciary Law, § 88, Subd. 2. All this is undisputed."

Unquestionably, attorneys in many states have saddled upon them most of the common law duties and obligations while many of the common law privileges no longer exist. For example, the right of a party to be represented by counsel is no longer a privilege to be obtained by special grant in each suit, but is now a right granted by the State Constitution (Article 1, Sec. 11) so that if it is still to be considered a privilege, it is at least one which cannot be taken away by any department of government. Further, there is no group in the American legal profession which corresponds to the position of the serjeant-at-law in England with a monopoly on the practice before the courts and from whom all judges are to be chosen. Nor is there a limitation on the number of attorneys who might practice as there was in the time of King Edward I when he directed the justices to choose 140 attorneys to follow the court and gave the right to practice before the courts exclusively to them.

In 5 Am. Jur. Sec. 11, p. 268 under the title of privileges and exemptions of the office of attorney is discussed the privilege or exemption from jury service. However, this

is not a sufficient exemption to place attorneys in a class. by themselves for in Utah an express statute, Sec. 48-0-10, R. S. U. 1933, designates some 14 different groups who are exempt from jury service. The common law exemption from arrest on civil process is also discussed, but it is there pointed out that some states have abolished the right and others seem to have never recognized it. In some jurisdictions it is held that since the attorney is an officer of the court an occupational tax on the office of attorney would be an unconstitutional invasion of the judicial power, but this is contrary to the majority rule. Annotation in 18 L. R. A. 409, 21 L. R. A. 783.

It is, therefore, clear that the attorney does not today occupy the same position accorded to the legal profession by the early common law. Yet many jurisdictions, while speaking dogmatically about the privileges without naming any, hold that the duties and obligations are annexed to privileges which have been conferred upon the office of the attorney. *In re Lavine,* 2 Cal. 2d 324, 41 P. 2d 161; *In re Rouss,* 221 N. Y. 81, 84, 116 N. E. 782, 783; *People* v. *Culkin,* supra; *In re Edwards,* 45 Idaho 676, 266 P. 665; *In re Hosford,* 62 S. D. 374, 252 N. W. 843; *In re Admission to the Bar,* 61 Neb. 58, 84 N. W. 611; Annotation, 130 A. L. R. 1439, 1444; 5 Am. Jur., Sec. 157, p. 354.

The present status of the attorney in our judicial system has been a result of historical development which dates back for some seven centuries. Regardless of what may have happened in some jurisdictions to the rights and privileges of attorneys, the right to practice before the court as an officer of the court, still remains. While doctors, plumbers, electricians, barbers, etc., may sell their time and skill to the public by virtue of their license from the state, the attorney alone has the right to set the judicial machinery in motion in behalf of another and to thus participate as an officer of the court in a judicial proceeding. This right springs from his status as an officer of the court. To properly function it is necessary

that courts retain control of their officers. The attorney's part has developed until he now is a necessary and essential part of our judicial machinery. For the past 650 years this status has been considered to be a privilege to which has been annexed, in addition to many other obligations, the duty to defend the poor without compensation. We cannot logically hold that there is no privilege to which the duty to render gratuitous service may be annexed and yet uphold the right of the courts to continue to enforce the other duties and obligations. Both are supported by the argument from history, and both are justified only because they are held to be correlative to the privilege of practicing law.

In addition to this privilege, it has been consistently held that the right of the legislative branch of the government to regulate and control attorneys is subject to the inherent power of the court ultimately to control admission to practice and disbarment. While the language in *Higgins* v. *Burton*, 64 Utah 562, 232 P. 914, might indicate that we do not adhere to this rule, in a later case, *In re Barclay*, 82 Utah 288, 24 P. 2d 302, 303, we stated:

"It is quite generally held that the power is inherent in the proper court to discipline, suspend, or disbar an attorney for misconduct, independent of any express provision of a statute conferring such authority."

In support of this, we cited an earlier case, *In re Platz*, 42 Utah 439, 132 P. 390, 392, where we stated:

"Nor can the Legislature limit the courts in their rights to determine the moral qualifications of their officers or prevent them from refusing to admit morally incompetent persons to practice, nor compel them to retain such upon the roll. * * * The courts, and not juries or legislators, must ultimately determine the qualifications and fitness of their officers."

The majority of jurisdictions concede that the legislature might make reasonable regulations governing the admission and disbarment of attorneys in the exercise of their police powers and in aid of the court's powers, but they hold that

the ultimate power of admission or disbarment is inherently with the courts. See *In re Bozarth*, 178 Okl. 427, 63 P. 2d 726, 728 (Citing cases from 25 Jurisdictions adhering to this rule) ; *State ex rel. Ralston* v. *Turner, Neb.*, 4 N. W. 2d 302; *In re Lavine*, 2 Cal. 2d 324, 41 P. 2d 161; *In re Bledsoe*, 186 Okl. 264, 97 P. 2d 556; *In re Day*, 181 Ill. 73, 54 N. E. 646, 50 L. R. A. 519. This freedom from control by all except the courts in which they are officers is deemed a privilege.

It has been suggested that to require an attorney to render his services without compensation would be taking property without due process of law in violation of the 14th amendment of the U. S. Constitution. The U. S. Supreme Court has consistently held that citizenship in the United States carries with it certain privileges, which are protected by the 14th Amendment. Thus an American Citizen has the right to

"life, liberty, and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions, are alike open to every one, and that in the protection of these rights all are equal before the law." *Cummings* v. *Missouri*, 4 Wall. 277, 321, 71 U. S. 277, 18 L. Ed. 356.

Again in *Smith* v. *Texas*, 233 U. S. 630, 34 S. Ct. 681, 682, 58 L. Ed. 1129, L. R. A. 1915D, 677, Ann. Cas. 1915D, 420, the court said:

"Life, liberty, property, and the equal protection of the law, grouped together in the Constitution, are so related that the deprivation of any one of those separate and independent rights may lessen or extinguish the value of the other three. In so far as a man is deprived of the right to labor, his liberty is restricted, his capacity to earn wages and acquire property is lessened, and he is denied the protection which the law affords those who are permitted to work. Liberty means more than freedom from servitude, and the constitutional guaranty is an assurance that the citizen shall be protected in the right to use his powers of mind and body in any lawful calling."

See, also, *Allgeyer* v. *Louisiana*, 165 U. S. 578, 17 S. Ct. 427, 41 L. Ed. 832; *Holden* v. *Hardy*, 169 U. S. 366, 18 S. Ct. 383, 42 L. Ed.

780; *Adair* v. *United States*, 208 U. S. 161, 28 S. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764.

The courts have held that the right to serve as a conductor on a railroad, subject to regulation by the state to assure fitness, is a privilege protected by the 14th Amendment. *Smith* v. *Texas*, supra. The right to engage in the bakery business is also protected. *Lochner* v. *New York*, 198 U. S. 45, 25 S. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133. As is the right to engage in the business of making character investigations. *Norwood* v. *Ward*, Atty. Gen., D. C., 46 F. 2d 312.

If the right to engage in the practice of law were one of those rights protected by the 14th Amendment, it might be unconstitutional to require those who engage in the practice of law to submit to the burdens now placed on the legal profession. But the cases hold that the right to practice law in the state courts is not a privilege or an immunity of a citizen of the United States which is protected by the 14th Amendment. In *Ex parte Lockwood*, 154 U. S. 116, 14 S. Ct. 1082, 1083, 38 L. Ed. 929, the court refused to review the order of the Virginia Sup. Court which denied the application of a woman for admittance to the bar of Virginia. The court, in so holding, said:

"the right to control and regulate the granting of license to practice law in the courts of a state is one of those powers that was not transferred for its protection to the federal government, and its exercise is in no manner governed or controlled by citizenship of the United States in the party seeking such license." See, also, *Philbrook* v. *Newman*, C. C., 85 F. 139, *Mitchell* v. *Greenough*, 9 Cir., 100 F. 2d 184; *Bradwell* v. *Illinois*, 16 Wall. 130, 83 U. S. 130, 21 L. Ed. 442; Robinson's case (*In re Robinson*), 131 Mass. 376, 41 Am. Rep. 239.

We therefore conclude attorneys do have privileges. They do enjoy the right to participate as officers in a judicial proceeding and the right to set the judicial machinery in motion. The court in admitting the attorney to practice presents him to the public as worthy of its confidence in all

of his professional duties. An attorney holds his office during good behavior and may only be deprived of it for misconduct ascertained and declared by the judgment of the court. Courts, by retaining ultimate control of admission to practice and of disbarment, have undertaken to protect the honor and high standing of the legal profession by refusing to admit those applicants who lack the necessary educational qualifications or who are morally incompetent, and dropping from the rolls those guilty of misconduct. Although this court has not as yet spoken on the matter, a minority of jurisdictions, supra, hold occupational taxes on attorneys to be unconstitutional.

In the final analysis, the legal profession as it is known today owes its very existence to our judicial system. The profession came into being as a result of the procedural development of the courts. It attained its present position as a result of a historical development which created the necessity for the attorney and made the attorney an essential part of our judicial machinery. Today, our judicial procedure is such that the attorney is indispensible. Although it is not likely to happen, there is nothing to prevent a change in procedure which would reduce the importance of the role of the attorney or possibly even completely obviate the necessity for counsel in a judicial proceeding. During this same historical development which elevated the attorney to his present enviable position, courts required that he go to the defense of the indigent.

We are convinced that the rule adhered to by the majority of jurisdictions is sound. The attorney, because of his position as officer of the court, can be compelled by the court to render gratuitous services in the defense of indigents, and an attorney who has been so appointed is not entitled to compensation from the public in the absence of a specific statute to the contrary. However, nothing in this opinion is to be construed as holding that the legislature has not the power or that it would not be the fair thing for it to make an appropriation for payment

for services rendered by attorneys who have been appointed by the court to defend impecunious litigants. The writ of mandamus should be and is hereby vacated.

LARSON, McDONOUGH, and MOFFAT, JJ., HOYT, District Judge, concur.

PRATT, Justice, on leave of absence.