(No. 35997.— )
*In re* JOHN W. GAVIN, Attorney, Respondent.

*Opinion filed January 20, 1961.*

J. R. CHRISTIANSON, of Chicago, *amicus curiae*.

CHARLES D. SNEWIND, LEN YOUNG SMITH, and ROBERT A. SPRECHER, all of Chicago, for respondent.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

The Committee on Grievances of the Chicago Bar Association as commissioners of this court filed a complaint charging the respondent in two counts with misconduct that brought the legal profession into disrepute. The first count charged respondent with accepting $600 in settlement of a personal injury claim of Florence Tree without her consent and procuring the execution of releases and the signing of a draft in payment thereof without the consent and authority of Mrs. Tree. The second count charged respondent with a failure to pay a $260 doctor bill after withholding an amount for expenses in the settlement of a personal injury suit of Clara Bandy.

It was found by the commissioners that the respondent's conduct tended to defeat the administration of justice and recommended that he be suspended from the practice of law for a period of three years. Respondent has filed exceptions to this report and here he contends that the evidence does not sustain the findings and conclusions appearing therein and does not justify their recommendation of punishment.

John W. Gavin was licensed to practice law in the State of Illinois in 1950. He is married and the father of three

children and previously has enjoyed an unblemished reputation.

We shall turn our attention to the second count, initially, since it is not so involved. In December of 1954, Clara Bandy received personal injuries which supplied the basis for a damage suit which she placed in the hands of respondent early in 1955. The fee agreed upon was one third of the amount recovered. In May 1956, the case was settled for $7,000 and Mrs. Bandy received $3,800. Of the $3,200 balance respondent was obligated to pay a $600 hospital bill and a $260 doctor bill. After a lapse of many months Mrs. Bandy discovered that her doctor bill had not been paid. The respondent apparently had withdrawn from the practice of law and was employed as a claim adjuster for an insurance company, and in doing so had changed his mailing address. Mrs. Bandy was unable to locate him and wrote the Chicago Bar Association setting forth the fact of non-payment of the doctor bill and expressed a desire to ascertain his whereabouts. The Committee on Grievances wrote respondent, enclosing a copy of Mrs. Bandy's letter and advising him that the letter was being treated as an inquiry, that respondent should write his explanation and that his answer should be filed promptly. A hearing on this complaint was set for March 17, 1958, but respondent testified that he did not receive the communication until long after it arrived at his old mailing address; that he thought he had paid the doctor bill; that he called the doctor on the telephone who assured him that he had not been paid; that after failing to find any proof of paying he mailed the doctor a check for $235 in June 1958; he explained the $25 discrepancy between $260, the amount claimed, and $235, the amount paid, by stating that the doctor admitted on the telephone that $25 of his bill was embraced in the $600 hospital bill. Mrs. Bandy protested rather firmly against being cast in the role of a complaining witness. She explained that she was not preferring charges against respondent when she

wrote the bar association, but simply was trying to find him so that she might bring to his attention his default in the payment of her doctor bill. And quoting from the record: "Q: And were you satisfied with the services Mr. Gavin rendered you? A. Sure, I was satisfied with him. Q: Mrs. Bandy, did you ever actually complain of anything Mr. Gavin had done while handling your case? A: No. I never did, he was mighty nice." She insisted that she never considered the neglect of her attorney any more than a mistake or an oversight.

The first count is more troublesome and involved many hearings. Mrs. Florence Tree was injured on June 29, 1956, while crossing a street intersection, by being struck by a vehicle owned by Ketone Automotive Company which was insured by United States Fidelity & Guaranty Company. She was taken to the Oak Park Hospital where X-ray pictures were taken and found negative. Before evening she left the hospital, suffering with a number of bruises. Soon thereafter Mrs. Tree employed respondent to represent her, upon the recommendation of a friend of hers. On July 17, 1956, Mrs. Tree executed a written contract employing respondent to represent her in her suit for damages, for a contingent fee of 33⅓%. A bitter controversy arises concerning the next phase of the contract. Respondent insists that at the bottom of the contract of employment he added the following: "The attorney may execute any documents or drafts on my behalf," which was signed by Mrs. Tree. He testified that it was her desire that he handle the matter for her in this fashion because "she was extremely nervous"; that she did not want to come down town and did not want to be bothered;" that "because of family differences [Mr. Tree] was not available;" and that "because of Mrs. Tree's obesity it was difficult for her to get around." Mrs. Tree admitted that she signed the contract of employment, but denied that she had signed the power of attorney, although she admitted "it looks like my signature."

On the hearing, only a purported photostatic copy of the contract was produced. Respondent was not able to account for the loss of the original.

Pursuant to his employment, respondent visited Mrs. Tree on several occasions and eventually secured a settlement with United States Fidelity & Guaranty Company on April 12, 1957, for $600. On that date Frank Fiore, claim adjuster for United States Fidelity & Guaranty Company, gave respondent a draft for $600 and releases to be executed by Mr. and Mrs. Tree. The draft was cashed by respondent and the names of Mr. and Mrs. Tree appeared on the releases, having been executed by respondent's secretary. Respondent claims that his action was authorized by the disputed power of attorney. Admittedly he did not possess such authorization from Mr. Tree but explained that Mr. Tree never made any claim against the company and he regarded his signature as a bare formality.

Mrs. Tree testified that she refused in April to accept the $600 offer of settlement and that, not hearing from any one for several months, she called United States Fidelity & Guaranty Company only to learn that her case had been settled, releases signed and the draft cashed. On June 24, 1957, Mrs. Tree employed Harold Huff and Tom C. Willson of the law firm of Peterson, Lowry, Rall, Barber & Ross, and they subsequently obtained for Mrs. Tree a satisfactory settlement.

Respondent testified that he wrote and telephoned Mrs. Tree several times to come to his office and complete the settlement. In December, 1957, he sent Mrs. Tree a check for $325 which he considered to be her share of the $600 settlement. This check was returned. He explained his delay in sending this, because he was awaiting a report from her newly acquired attorneys. It was stipulated that the $600 was returned to United States Fidelity & Guaranty Company after these proceedings were instituted by the Chicago Bar Association.

Frank Fiore who negotiated the $600 settlement for United States Fidelity & Guaranty Company testified "I felt then that I had negotiated a fair and competent settlement based on her condition and the medicals and specials she had," and while respondent was in his office he heard him make a telephone call and said "As I recall, it was a conversation where he sought approval of his client."

Walter F. Kelly, appearing for respondent, testified that he was licensed to practice law in Illinois in 1931; that at present he is a referee in the Monroe Street court; that he had been with the Pennsylvania Casualty Company for six years and had charge of their personal injury law suits, claims and investigations in five States; and that he had final authority in the settlement of all claims in excess of $1,000. Kelly testified that he had advised with respondent in the handling of the Tree case; that "I would guess sometime in March, 1957, respondent called Mrs. Tree on the telephone in my presence." He said to her he had gotten the $600 that she wanted; that he had seen respondent's file and at the time of the conversation above quoted the file contained the releases, the draft and power of attorney, and that he saw the original power of attorney with Mrs. Tree's signature affixed thereto. He testified he had also seen the signed power of attorney in January or February, 1957, prior to the settlement.

Nick B. Cindric, called by respondent, testified that he owned and operated the Cindric Auto Body Shop in La-Grange and was president of the Pack Manufacturing Co. which makes abrasive segregators. Cindric had become well acquainted with Mrs. Tree while she was working in the office of George E. Fowlie, which was in the same building occupied by Cindric. He testified that Mrs. Tree told him about her accident, and in discussing the advisability of employing counsel she said that she did not have much faith in the legal profession, that one time she was "gyped" by a

lawyer. Nevertheless she accepted his recommendation to employ respondent in her recent accident. Counsel for respondent sought to show by this witness that Mrs. Tree was a very heavy woman and that she drank excessively, but the commissioners sustained objection to this line of questioning.

Further, Cindric testified that he had several conversations with Mrs. Tree on the telephone; that on one occasion she told him that Gavin had settled her case for $600 and that she was not satisfied and that witness said: "Well, if you are not satisfied how could he settle the case?" and she said: "Well, I had given him power of attorney to settle the case," and that witness said: "Well, if you gave him power of attorney to settle your case, he could have settled for two dollars," and she said: "I don't give a damn if he does have power of attorney. I am going to get another attorney and I am going to fight him." Mrs. Tree denied this conversation, denied that she drinks intoxicating liquor, denied that she uses profanity, such as "damn," and stated that she had had only one telephone conversation with Cindric and that concerned an altogether different matter.

At this juncture counsel for respondent requested another hearing when he might produce Mrs. Cindric that she might corroborate Mr. Cindric and contradict Mrs. Tree; also George E. Fowlie, the former employer of Mrs. Tree, who would testify that Mrs. Tree frequently came to work in an intoxicated condition; that her veracity and mental health were more than questionable; that he could not believe anything she said; that she was discharged because of admitted dishonesty and that she lost little if any time from her employment because of her accident. The commissioners ruled, and properly so, that there had to be an end to these hearings and that much of the proposed testimony should have been introduced on previous hearings.

Respondent offered to produce a handwriting expert to prove the genuineness of Mrs. Tree's signature to the power

of attorney. It was ruled that since Mrs. Tree was not firm in her denial of it being her signature, it was unnecessary to prolong the hearings to hear such proof.

· Willson, one of the complainant's new lawyers, testified that he and Huff met with respondent and discussed the case with him; that his discussion revealed practically the same set of facts as made by him on this hearing; that "he submitted his entire file. He was cooperative in whatever I asked him for." The file did not, however, contain the original contract.

We have uniformly held that the evidence to discipline an attorney must be clear and convincing. *In re Moore,* 8 Ill.2d 373; *In re Power,* 407 Ill. 525; *People ex rel. Chicago Bar Ass'n v. Lotterman,* 353 Ill. 399.

*Amicus curiae* in his brief places complete reliance upon the *Ashbach case* as a precedent for their recommendation that respondent be suspended from the practice of law for a period of three years. (*In re Ashbach,* 13 Ill.2d 411.) There one of the counts related to Joyce Bacon and Annie Marie Putman who employed Ashbach to represent them in a personal injury suit for a fee of one half of the amount recovered. There was a dispute as to whether the women signed blank powers of attorney. In February, 1953, Ashbach settled both cases without consulting his clients, the Putman case for $150 and the Bacon case for $1350. Although Ashbach claimed authority for his action by virtue of a power of attorney, he admitted that in writing the signatures of his clients he had attempted to imitate their signatures. He cashed the drafts and placed his clients' signatures on them in the same fashion. Miss Bacon called Ashbach in March and many times thereafter, and he withheld information that her case had already been settled. Not until May 1st did Miss Bacon receive his check for $270 and Mrs. Putman for $75. Miss Bacon deposited her check on May 29, 1953, but it was returned because Ashbach had closed his account there. In August, 1953, Miss Bacon re-

tained another attorney who obtained for her an additional $475 and for Miss Putman $100. The court found that Ashbach's attempted explanation of his dishonest practice was unworthy of belief, the court saying "we are shocked by respondent's defense to the Bacon charge." There are three other counts in the *Ashbach case* involving a similar pattern of dishonesty.

We do not believe that respondent's conduct is comparable to that of *Ashbach*. We do not agree with the recommendation of the discipline to be imposed in this case. Giving respondent the benefit of the corroborating testimony coming from unimpeached and disinterested witnesses, we have reached the conclusion that respondent's conduct deserves only censure; that his conduct did not indicate a professional impropriety importing moral turpitude. Respondent was dealing with a difficult person who was not satisfied with the proposed settlement of her claim. It was extremely unwise for him to find refuge in the disputed power of attorney and undertake to force Mrs. Tree to accept the settlement he had made for her. Respondent's explanation for the power of attorney in this case is a plausible one, but it is a practice that should be avoided since it is so readily susceptible of abuse. Respondent's delay in paying the doctor bill in the Bandy case is open to criticism. Signing the name of Mr. Tree to the release under the circumstances of this case did not necessarily import dishonest motives. Nevertheless his conduct impels our censure.

Any disciplinary action is serious punishment for any self-respecting lawyer. As Judge Cardozo once said in connection with the investigation of a lawyer's conduct, "The mere summons to appear at such a hearing and make a report as to one's conduct may become a slur and a reproach." *People ex rel. Karlin v. Culkin*, 248 N.Y. 465.

These proceedings posed a destruction of respondent's professional life. Because of this threat he lost the position he had with an insurance company and he has been unable

to obtain another. There were a multitude of hearings that were time consuming and expensive, in addition to the humiliation of Gavin and his family.

We are sure that respondent's experience has deepened his appreciation of the ethics of the profession and of the necessity of being more careful in his dealings with the public and, in particular, with difficult clients.

*Respondent censured.*